```
                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEVADA
                           RENO, NEVADA


BRUCE EDWARD DEWING,          )    3:01-CV-0575-ECR-VPC
                              )
                              )
Plaintiff,                    )
                              )    ORDER
vs.                           )
                              )
MTR GAMING, INC.,             )
a Delaware Corporation,       )
                              )
Defendant.                    )
_____)
```

**I. Procedural Background**

On November 14, 2003, Plaintiff Bruce Edward Dewing ("Plaintiff" or "Dewing") filed an Amended Complaint (#36) against MTR Gaming Group, Inc., ("Defendant" or "MTR") for damages, alleging breach of contract, breach of implied covenant of good faith and fair dealing, tortious breach of the implied covenant of good faith and fair dealing and seeking declaratory judgment on the expiration of stock options, and whether sufficient consideration supported the contracts between MTR and Dewing.[1]  On March 15,

---

[1] We previously granted Defendant's motion to dismiss, holding that the parol evidence rule would prevent Plaintiff Dewing from proving that MTR had undertaken an obligation to register his stock options.  On August 8, 2003, the Ninth Circuit Court of Appeals reversed our decision finding that while the parol evidence rule prohibits the introduction of contemporaneous oral statements or agreements that contradict the terms of the written instrument, the

2005, Plaintiff Dewing and Defendant MTR filed contemporaneous Motions for Summary Judgment (Defendant #79 and Plaintiff #80). Plaintiff responded (#84) on April 11, 2005, and Defendant replied (#92). Defendant responded (#83) on April 11, 2005, and Plaintiff replied (#89) on April 25, 2005.  The motions are now ripe and we now rule on them.

For the reasons stated below, both Defendant's and Plaintiff's motions will be **DENIED**.

**II.  Statement of Facts**

On June 1, 1998, Dewing signed an Employment Agreement with Speakeasy Gaming of Reno whose parent company is Defendant MTR. Dewing terminated his Employment Agreement ("Employment Agreement") with Speakeasy Gaming on or about May 10, 2000, by the execution of an Agreement Terminating Employment ("Termination Agreement") and became a consultant to MTR through a Consulting Agreement ("Consulting Agreement"), which terminated May 31, 2001.  The Consulting Agreement discussed Dewing's future duties and compensation but did not discuss previous employment and compensation or other previous terms of employment.  Under the Employment Agreement, Dewing was to be granted non-qualified stock options to purchase 50,000 shares of Common Stock of Defendant MTR. Under the Termination Agreement, Dewing was allowed to keep the stock options granted under the Employment Agreement subject to the

---

parol evidence rule did not prohibit evidence that MTR had previously undertaken an obligation to register the options as such a promise would not have conflicted with the terms of the written agreement.

2

terms of the stock options granted as his personal property. Dewing claims that the consideration given for Dewing's execution of the Termination and Consulting Agreements was representations that Dewing's stock options would remain valid and exercisable.

On February 24, 1999, MTR granted Dewing those options to purchase 50,000 shares of MTR stock at the exercise price of $2.00 per share. Later, on March 13, 2000, MTR granted Dewing a second option to purchase 50,000 shares of MTR stock at the exercise price of $2.50 per share.[2]

Prior to the execution of the Termination and Consulting Agreements, Dewing intended to exercise his options and had contacted his stock broker, Jim Laughton ("Laughton") of Prudential Securities (now Wachovia).[3] Laughton then contacted Robert L. Ruben, Vice President and General Counsel for MTR. Dewing intended

---

[2] The agreement stated:

[o]ption shall be exercisable by giving written notice to the Company at its principal office...stating that the Optionee is exercising this Option, specifying the number of shares being purchased and accompanied by payment in full of the aggregate purchase price thereof: (a) in cash or by certified check; (b) with previously acquired shares of Common Stock having an aggregate Fair Market Value on the date of exercise equal to the aggregate exercise price of all Options being exercised; (c) with any combination of cash, certified check or share of Common Stock having such value; or (d) any other form of legal consideration that may be acceptable to the Board in its sole discretion.

[3] Dewing had wanted to engage in an "exercise and sell" meaning that Prudential Securities would be lending the money for the exercise of the options with the understanding that the shares would be sold as soon as the options were exercised. Prudential Securities would recover interest from the procedure and Dewing would have recovered the profits minus the interest.

In order for Prudential Securities to invest in the "exercise and sell" the shares needed to be registered so that the shares would be immediately saleable upon exercise of the options.

to carry out an "exercise and sell" of his MTR stock options funded by Prudential Securities.  However, for Prudential Securities to fund such a transaction, the underlying shares subject to the options were required to be registered with the S.E.C.  Dewing believed that the shares had been registered and had represented this to Laughton.  However, Laughton was told by Ruben that the shares were not registered.  Dewing then followed up with Ruben and was told that Dewing's shares would be registered in a registration statement after the MTR Board of Directors Meeting in August, 2000.

However, Dewing's shares were not registered after the MTR Board of Directors meeting and Dewing again contacted Ruben.  Ruben reiterated that the registration statement would be filed soon and that Dewing's shares would be included.  Edson R. Arneault, President, Secretary, and Treasurer of MTR and Speakeasy, also assured Dewing that his shares were soon to be registered.

After the conversations with Arneault and Ruben, MTR informed Dewing that he would be required to sign Non-Qualified Stock Option Agreements ("NQSO Agreements") relating to Dewing's stock options that he had previously been granted.  Dewing claims that Ruben represented to Dewing that if he did not sign the NQSO Agreements, Dewing's shares would not be registered.  Dewing signed the NQSO Agreement on October 13, 2000.

Following the signing of the NQSO Agreements, MTR became less responsive to Dewing's requests that his shares be registered.  Due to this non-responsiveness, Dewing had his lawyer, Donald Lattin ("Lattin"), send a letter to Ruben on November 20, 2000.  Lattin informed MTR that MTR had an obligation to register the shares and

4

if MTR did not file the registration statement, Dewing would be left with no option but to assert his legal rights.

Ruben responded to Lattin's letter stating that there was no legal obligation to register the shares and that MTR would not be filing such a registration statement.[4]

**III.  Discussion**

**A.  Jurisdiction and Applicable Law**

We have diversity jurisdiction over this state law cause of action pursuant to 28 U.S.C. § 1332.  Hence we are obligated to apply Nevada state law, as determined by reference to the decisions of the Supreme Court of Nevada.  Mirch v. Frank, 295 F. Supp. 2d 1180, 1183 (D. Nev. 2003).

**B.  Summary Judgment Standard**

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists.  Northwest Motorcycle Ass'n v. U.S. Department of Agriculture, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court must view the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment

---

[4] During these negotiations, Dewing claims that MTR was aware that his family was suffering a medical crisis and was in need of money to pay for medical expenses.

5

as a matter of law. Fed. R. Civ. P. 56(c). Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party. Fed. R. Civ. P. 50(a). Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 116 S.Ct. 1261 (1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although the parties may submit evidence in an inadmissible form-- namely, depositions, admissions, interrogatory answers, and affidavits--only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed. R. Civ. P. 56(c); Beyene v. Coleman Security Services, Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof. Anderson, 477 U.S. at

248. Summary Judgement is not proper if material factual issues exist for trial. B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999). "As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Disputes over irrelevant or unnecessary facts should not be considered. Id. Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other facts become immaterial, and the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 323. Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole. Id.

**C.  The Existence of an Oral Agreement or Oral Representations to Dewing Concerning Registration of the Shares**

Whether or not there were representations made to Dewing concerning the registration of shares and whether those representations were sufficient to constitute consideration[5] for

---

[5] While Dewing has produced evidence that MTR made representations to him that such registration of his shares would take place, Dewing has yet to produce evidence that such representations were converted into an agreement between MTR and Dewing. In particular, Dewing has not produced evidence that there was consideration for such representations. As stated below, it appears that the Nevada Supreme Court would likely adopt the Restatement view of this. See Restatement (Second) of Contracts, § 71 ("To constitute consideration, a performance or return promise must be bargained for. A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise."). The Ninth Circuit ruling on this case does not militate against this conclusion. The Ninth Circuit ruling pertained to whether or not parol evidence could be admitted to show evidence of such an oral representation-the Circuit did not conclude that there was definitively such an agreement.

7

the signing of the NQSO Agreements is a question of material fact that cannot be resolved in these motions for summary judgment.

Dewing has presented evidence through his own testimony that MTR made representations to him concerning registration of his stock prior to the signing of the NQSO Agreements.[6] MTR has also presented evidence through statements made by MTR executives that no such representations were made to Dewing and that they were under no legal obligation to register the shares. MTR consistently in communications made to Dewing and his representatives maintained that MTR was under no duty to register the shares because MTR had never made such a promise.

There is a question of material fact as to whether there were oral representations and whether such oral representations were the basis for consideration for the signing of the NQSO Agreements.

## D. Declaratory Judgment

Plaintiff has sought declaratory judgment on the validity of the NQSO Agreements as well as the date of expiration of his stock options.

---

[6] MTR claims that Dewing could not have justifiably relied on those representations to register because as early as December 2000, Dewing was aware that the shares would not be registered. Dewing, however, has presented evidence to the contrary-showing that he justifiably relied on statements that in exchange for his signing the NQSO Agreements, the shares would finally be registered after repeated promises to register them at Dewing's request. Whether or not MTR disputes that such representations had in fact been made as early as December 2000 does not refute the fact that Dewing may have justifiably relied on such representations before and would have construed such representations as a legal obligation on behalf of MTR despite their repeated refusal to admit to such a legal obligation.

8

Since there is a genuine issue of material fact as to whether there were oral representations made to Dewing prior to signing the NQSO Agreements, there is an issue as to whether the NQSO Agreements are valid and enforceable.  Since the oral representations might constitute the consideration for the NQSO Agreements, the existence of the oral representations will alter the validity and enforceability of the NQSO Agreements.

The Nevada Supreme Court in Pink v. Busch quoted the Restatement (Second) of Contracts in holding that "[t]o constitute consideration, a performance or return promise must be bargained for.  A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise."  100 Nev. 684, 688, 691 P.2d 456 (1984).

Here, Dewing claims that the "bargained for exchange" occurred when Dewing signed the NQSO Agreements in exchange for the promise of MTR to register his shares.

MTR argues that the NQSO Agreements are valid regardless of whether there were oral representations made to Dewing concerning the registration of the stock options.  MTR claims that the consideration is provided in the Employment Agreement which required the parties to enter into stock option agreements concerning options that Dewing had been or would be granted. Although the Employment Agreement was terminated by the Termination Agreement, the rights and property associated with the stock options Dewing had been granted in 1999 and 2000 remained the property of Dewing.  However, MTR argues, the stock options granted

9

to Dewing through the Termination Agreement included the limitations on the grant of stock options which encompassed the requirements that Dewing and MTR enter into agreements governing the granting of the stock options.

Dewing has presented evidence that the Termination Agreement gave Dewing the stock options subject only to previous agreements governing the granting of those stock options. Therefore, there remains an issue of material fact as to whether the NQSO Agreements could have been supported by the consideration of the Employment Agreement.

Therefore, there is a question of fact as to the consideration for the NQSO Agreements. Whether and how the NQSO Agreements are supported by consideration is a question of fact that cannot be resolved by these motions for summary judgment.

In addition, since the NQSO Agreements changed the dates of exercise of the options for Dewing, and since the NQSO Agreements' validity has not been established, the exercise dates of the options cannot be resolved through the motions for summary judgment.[7]

---

[7] Accordingly, we note that Defendant's argument that Dewing failed to exercise his options prior to their expirations cannot be resolved at this time. Because the date of expiration of the options is a subject of reasonable question, we cannot rule that Dewing did not exercise his options in time.

Along the same lines, we cannot rule on the question of whether Dewing failed to mitigate his damages. It is true that this court has held that the Nevada Supreme Court requires mitigation of damages for losses flowing from a breach of contract or tort. See Interstate Commercial Bldg. Services, Inc. v. Bank of America Nat. Trust & Sav. Ass'n, 23 F. Supp. 2d 1166, 1176-77 (D. Nev. 1998); Women's Federal Sav. And Loan Ass'n of Cleveland v. Nevada Nat'l Bank, 607 F.Supp. 1129, 1135 (D.Nev. 1985)(reversed on other grounds)(811 F.2d 1255 (9th Cir. 1987). Whether Dewing failed to exercise his options by the

10

**E.   Breach of Implied Covenant of Good Faith and Fair Dealing**

Plaintiff has also claimed a breach of implied covenant of good faith and fair dealing.[8]  The Nevada Supreme Court has held "[w]here the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intentions and spirit of the contract, that party can incur liability for breach of implied covenant of good faith and fair dealing."  Hilton Hotels Corp. v. Butch Lewis Prod. Inc., 107 Nev. 226, 234, 808 P.2d 919, 922-23 (1991).

In K Mart v. Ponsock, the Nevada Supreme Court held that in some employment relationships, the employee is dependent and relies on the employer especially for continued employment and receipt of promised benefits.  103 Nev. 39, 51, 732 P.2d 1364 (1987).  If the employer tortiously withholds those benefits, the employer may breach the tort based implied covenant of good faith and fair dealing.  However, not every employer/employee relationship will create a special relationship which will justify tort damages.  A "special reliance" trust dependency apparent in insurance cases must be present as well.  Id.

Here, there is an issue of material fact as to whether a special relationship existed between MTR and Dewing and whether the

---

expiration dates is a question of fact and therefore whether Dewing was obligated to exercise his options before the expiration date in order to reduce damages is also a question of fact.

[8]Plaintiff claims that Defendant failed to oppose his motion for summary judgment based on this claim.  However, we will construe Defendant's motion for summary judgment on this claim as its opposition to Plaintiff's motion for summary judgment.

11

alleged refusal to register Dewing's shares and allow Dewing to exercise his options constitutes a tortious denial of benefits.

Dewing has presented evidence that he depended on the statements of MTR executives that his shares would be registered and that he could not exercise his options at the point in which he requested them to be exercised.  This has raised an issue of material fact as to whether there was a special relationship between MTR and Dewing that would justify tort damages.

In addition, there is a question of fact, as explained above, as to whether MTR actually represented to Dewing that his shares would be registered.

**F. Dewing's Breach of NQSO Agreements**

Because there is an issue of material fact as to whether the NQSO Agreements were supported by consideration, whether Dewing breached such agreements is, therefore, also an issue of material fact.

**G.   Breach of Implied Covenant of Good Faith and Fair Dealing with Respect to the NQSO Agreements**

We construe Defendant's motion for summary judgment on the issue of breach of implied covenant of good faith and fair dealing with respect to the NQSO Agreements as its opposition to Plaintiff's motion for summary judgment on this issue and reject Plaintiff's argument that Defendant has failed to oppose his motion.

12

Because the NQSO Agreements' validity are in dispute, there is an issue of material fact as to whether the implied covenant of good faith and fair dealing with respect to the NQSO Agreements has been breached.

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (#80) is **DENIED**.

**IT IS FURTHER HEREBY ORDERED** that Defendant's Motion for Summary Judgment (#79) is **DENIED**.

This 24th day of January, 2006.

*Edward C. Reed.*
_____
UNITED STATES DISTRICT JUDGE